Slip Op. 19-26

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **MCKESSON CANADA CORP.,** | |
| Plaintiff, | **Before: Jane A. Restani, Judge** |
| v. | |
| **UNITED STATES,** | **Court No. 10-00151** |
| Defendant. | |

## <u>OPINION</u>

[In Customs classification matter, Plaintiff's motion for summary judgment is granted and Defendant's cross-motion for summary judgment is denied.]

Dated: February 28, 2019

<u>John M. Peterson</u>, <u>Russell A. Semmel</u>, <u>Maria E. Celis</u>, and <u>Richard F. O'Neil</u>, Neville Peterson, of New York, NY, for Plaintiff McKesson Canada Corporation.

<u>Justin R. Miller</u>, Senior Trial Counsel, Civil Division, U.S. Department of Justice, of Washington D.C., for the defendant.  With him on the brief were <u>Amy M. Rubin</u>, Assistant Director, International Trade Office, and <u>Benjamin C. Mizer</u>, Deputy Assistant Attorney General.  Of counsel on the brief was <u>Yelena Slepak</u>, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, of Washington, D.C.

Restani, Judge:  This matter is before the court on cross-motions for summary judgment made by plaintiff McKesson Canada Corporation ("McKesson"), an importer of pharmaceutical equipment, and defendant United States ("the government").  <u>See</u> Mem. of McKesson Canada Corp. in Supp. of Pl.'s Mot. for Summ. J., Doc. No. 79 ("McKesson Br."); Mem. in Supp. of Def.'s Cross-Mot. for Summ. J., Doc. No. 90 ("Gov't Br.").  McKesson argues that the merchandise is properly classified under heading 8422 of the Harmonized Tariff Schedule of the

United States ("HTSUS")[1] as a composite machine whose sole or principal function is packing, specifically, HTSUS 8422.40.91. See McKesson Br. at 3–14; Reply of McKesson in Supp. of Pl.'s Mot. for Summ. J. & Resp. in Opp. to Def.'s Cross-Mot. for Summ. J., Doc. No. 102 ("McKesson Resp.").  The government, however, asserts that the United States Customs and Border Protection ("Customs") properly classified the subject merchandise under the residual basket subheading 8479.89, HTSUS, for "[m]achines and mechanical appliances having individual functions, not specified or included elsewhere in [Chapter 84]; Other" and not under heading 8422.  See Gov't Br. at 15–38; Reply Mem. in Supp. of Def.'s Cross-Mot. for Summ. J., Doc. No. 111 ("Gov't Reply").  For the reasons stated below, McKesson's motion is granted and the government's cross-motion is denied.

## BACKGROUND

The following facts are undisputed.  The subject merchandise is an "automated pharmacy system" referred to as a PACMED ("Pacmed") machine and described as "a gravity-fed unit dose . . . or multi dose . . .  pill dispensing and packaging system" for use in hospitals and retail pharmacies.  Statement of Facts of McKesson in Supp. of Pl.'s Mot. for Summ. J. ¶¶ 1–3, Doc. No. 79-1 ("Pl.'s Stmt. of Facts").[2]  Its purpose is to "[p]romote compliance, patient safety and medication management" by ensuring that the appropriate amount of prescribed medication is packaged into a pouch and labeled with a patient's identifying information.  Id. ¶¶ 13, 19, 24.

---

[1] All citations to the HTSUS, including Section and Chapter Notes, are to the 2008 edition, the version in effect at the time of importation.  Although there are no material changes to the relevant subheadings since that time, subheading 8479.89.98 is now 8479.89.94.

[2] The facts cited in this opinion and averred in McKesson's Statement of Facts are either admitted by the government or deemed admitted because the government's objections thereto were immaterial or inapposite.

McKesson imports four Pacmed models.[3]  Id. ¶ 15.  The Pacmed is a composite machine,
composed of a partially transparent pill canister compartment mounted on top of a packaging
compartment, which are housed together in a large cabinet.  Id. ¶¶ 4, 24.  The unit features a
touch screen that is used to input and receive data concerning the medication to be processed.  Id.
¶¶ 4, 8.  The upper compartment contains several canisters that are stocked by a user with a
registered quantity of pills and features a bar code or electronic chip that allows the system to
identify and monitor inventory.  Id. ¶¶ 5, 6.  The lower compartment is loaded with reels of
plastic packaging material and printer ribbons.  Id. ¶ 7.  A printer in the lower compartment
prints the patient and prescription data, including a bar code, directly onto the packaging
material.  Id. ¶ 11.  After a user initiates an order based on a patient's information, the canisters
release the specified quantity of medication, verified by an electronic scale, onto the packaging
material, which is then sealed into a pouch containing the pills.  Id. ¶¶ 9–10, 12.  The pouch can
be retrieved by a health care worker through a slot at the bottom of the unit for delivery to
patients.  Id. ¶ 13.  The Pacmed unit works alongside a digital scale, a barcode scanner, and a
computer workstation running Microsoft Windows and Pacmed Core software.  Id. ¶ 8.

Between July 2008 and November 2008, McKesson made entries of the Pacmed
machines at the Port of Champlain, NY.  Compl. ¶ 11, Doc. No. 6 (Feb. 10, 2011).  Customs
liquidated the entries between May 2009 and September 2009, classifying the merchandise under
subheading 8479.89, which corresponded to a duty rate of 2.5% ad valorem.  Id. ¶ 12.
McKesson filed a protest and requested a ruling as to the proper classification of the

---

[3] The imported Pacmed models vary only in physical dimension, ranging from approximately
three feet by three feet by six feet, at 1,060 pounds, to approximately three feet by four feet by
seven feet, at 2,540 pounds.  See Pl.'s Stmt. of Facts ¶¶ 16–17.  A Pacmed holds between 100
and 500 canisters and, on average, packages fifty to sixty pouches per minute.  Id. ¶¶ 14, 17.

merchandise.  Id. ¶ 14.  On September 29, 2009, Customs issued a letter ruling, asserting that the

Pacmed should be classified under the residual basket category for "[m]achines and mechanical

appliances having individual functions, not specified or included elsewhere in this chapter; parts

thereof: Other machines and mechanical appliances: Other . . . Other . . . Other" under

subheading 8479.89.9899, HTSUS.  Cust. Rul. NY N074022 (Sept. 29, 2009).  In the ruling,

Customs described the merchandise as a "composite machine" that includes "a labeling machine,

a hopper, packaging and a dispensing machine."  Id.  But it argued that the packaging was

"ancillary to the performance of the machine's dispensing function," excluding heading 8422.

Customs reasoned, instead, that the merchandise was a "composite machine consisting of various

processing modules which consecutively perform complementary separate functions . . .

described in different headings of Section XVI,"  which all "contribute to the principal function

of the composite machine, i.e., the distribution of pharmaceuticals."  Id.  Accordingly, Customs

denied McKesson's protest on November 12, 2009, and classified the merchandise under

subheading 8479.89.98.  Compl. ¶ 15.  This action ensued.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over the denial of a protest pursuant to 28 U.S.C. § 1581(a)

(2006).[4]  The court grants summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

USCIT Rule 56(a).  In tariff classification cases, "summary judgment is appropriate when there

is no genuine dispute as to the underlying factual issue of exactly what the merchandise is."

Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1365 (Fed. Cir. 1998).  The court decides

---

[4] All statutory citations are to the 2006 edition of the United States Code.

classifications de novo. See 28 U.S.C. § 2640(a)(1); Telebrands Corp. v. United States, 865 F.

Supp. 2d 1277, 1279–80 (CIT 2012).

## DISCUSSION

The HTSUS is organized by headings, which set forth "general categories of

merchandise," and each have one or more subheadings that "provide a more particularized

segregation of the goods within each category." Deckers Outdoor Corp. v. United States, 714

F.3d 1363, 1366 (Fed. Cir. 2013).  Tariff classification under the HTSUS is governed by the

General Rules of Interpretation ("GRIs") and, if applicable, the Additional U.S. Rules of

Interpretation ("ARIs").  See Wilton Indus. v. United States, 741 F.3d 1263, 1266 (Fed. Cir.

2013) (citing Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998)).  The

GRIs "are applied in numerical order and a court may only turn to subsequent GRIs if the proper

classification of the imported goods cannot be accomplished by reference to a preceding GRI."

Id.  According to GRI 1, "classification shall be determined according to the terms of the

headings and any relative section or chapter notes, and provided such headings or notes do not

otherwise require, according to the [remaining GRIs]."[5]  See GRI 1.  Absent contrary legislative

intent, the terms of the headings are "construed according to their common and commercial

meanings, which are presumed to be the same." Carl Zeiss, Inc. v. United States, 195 F.3d 1375,

---

[5] According to Explanatory Note V(a) to GRI 1, "the terms of the headings and any relative
Section or Chapter Notes are paramount, i.e., they are the first consideration in determining
classification."  World Customs Organization, Explanatory Note V(a) to GRI 1, HTSUS.  Thus,
the HTSUS is designed such that the headings and relevant notes are to be exhausted before less
precise inquiries, such as those of GRI 3, are considered, e.g., specificity or essential character.
Telebrands, 865 F. Supp. 2d at 1280–81; accord Mita Copystar Am. v. United States, 160 F.3d
710, 713 (Fed. Cir. 1998) ("[I]t is not appropriate to reach [GRI 3] if GRI 1 dictates the proper
classification for particular merchandise.").

1379 (Fed. Cir. 1999).  "The section and chapter notes are not optional interpretive rules, but are

statutory law."  BenQ Am. Corp. v. United States, 646 F.3d 1371, 1376 (Fed Cir. 2011).

        For additional guidance as to the scope and meaning of tariff headings and notes, the

court also may consider the Explanatory Notes ("ENs") to the Harmonized Commodity

Description and Coding System, developed by the World Customs Organization.  See Carl Zeiss,

195 F.3d at 1378 n.1 (Fed. Cir. 1999).  Although Explanatory Notes are not binding on the court,

they are "indicative of proper interpretation" of the tariff schedule.  Id. (citing H.R. Rep. No.

100–576, at 549 (1988), as reprinted in 1988 U.S.C.C.A.N. 1547, 1582).[6]

        Here, the parties agree that there is no genuine dispute as to the nature of the merchandise

and, accordingly, summary judgment is appropriate.  See McKesson Br. at 4; Gov't Br. at 3–4.

The resolution of the case, therefore, turns on the meaning of the HTSUS provisions.

**I.       Competing Tariff Provisions**

        The parties agree that the merchandise properly falls under Chapter 84 of Section XVI,

HTSUS, and the court has not uncovered a more apt classification provision elsewhere in the

tariff schedule.  See Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984)

("[T]he court's duty is to find the correct result, by whatever procedure is best suited to the case

at hand.") (emphasis in original).  The relevant portions of Chapter 84 of the HTSUS read:

    8422            Dishwashing machines; machinery for cleaning or drying bottles or
                    other containers; machinery for filling, closing, sealing or labeling
                    bottles, cans, boxes, bags or other containers; machinery for
                    capsuling bottles, jars, tubes and similar containers; other packing
                    or wrapping machinery (including heat-shrink wrapping
                    machinery); machinery for aerating beverages; parts thereof: . . .

---

[6] Citations to the Explanatory Notes ("ENs") in this Opinion are to the 2007 edition, the relevant
provisions of which were in effect at the time of importation.  See World Customs Org.,
Explanatory Notes to the Harmonized Commodity Description and Coding System (4th ed.
2007).

| | |
|---|---|
| 8422.40 | Other packing or wrapping machinery (including heat-shrink wrapping machinery): . . . |
| 8422.40.91 | Other |
| . . . | |
| 8479 | Machines and mechanical appliances having individual functions, not specified or included elsewhere in this chapter; parts thereof: . . . |
| 8479.89 | Other machines and mechanical appliances: . . . |
| 8479.89.98 | Other |

McKesson argues that its Pacmed machines fall under heading 8422.  Heading 8422

covers machines, generally, for "packing . . . goods for sale, transport or storage."  EN Heading

84.22.  This includes "[m]achines for filling containers (e.g., casks, barrels, cans, bottles, jars,

tubes, ampoules, boxes, packets or bags), frequently equipped with subsidiary automatic volume

or weight control and with devices for closing the containers."  Id.  The heading also includes

wrapping machines, "including those with provision[s] for forming, printing, typing, stapling,

taping, glueing, closing or otherwise finishing the packing" as well as labeling machines.  Id.

The machines will "frequently perform several of the foregoing functions."  Id.  Furthermore, the

Explanatory Notes advise that

> [m]achines which in addition to packing, wrapping, etc., also perform other
> operations remain classified in the heading **provided** the additional operations are
> incidental to the packing, etc. Thus machines which pack or wrap good into the
> forms or presentations in which they are normally distributed and sold in
> commerce, are classified in this heading, whether or not the machines also contain
> devices for weighing or measuring.

Id. (emphasis in original).

The government proffers heading 8479 as the proper classification for McKesson's

machines.  Heading 8479 is a residual "basket" provision, which applies only where no other

Chapter 84 heading appropriately covers the subject merchandise.  EN Heading 84.79 (stating

that heading 8479 "is restricted to machinery having individual functions, which cannot . . . be

classified in any other particular heading of this Chapter"); see also HTSUS Ch. 84, Note 2 ("[A]

machine or appliance which answers to a description in one or more of the headings 8401 to

8424 . . . and at the same time to a description in one or more of the headings 8425 to 8480 is to

be classified under the appropriate heading of the former group . . . and not the latter group.");

Chevron Chem. Co. v. United States, 59 F. Supp. 2d 1361, 1368 (CIT 1999) ("Classification of

imported merchandise in a basket provision, however, is appropriate only when there is no tariff

category that covers the merchandise more specifically.").  Thus, the court begins by determining

whether the merchandise is classifiable under heading 8422.

## II.      Heading 8422, HTSUS (Plaintiff's Claimed Classification)

The parties agree that the Pacmed is a "composite machine" within the meaning of Note

3 to Section XVI.  See Pl. Stmt. of Facts ¶ 24.  Pursuant to Note 3,

> [u]nless the context otherwise requires, composite machines consisting of two or
> more machines fitted together to form a whole and other machines designed for
> the purpose of performing two or more complementary or alternative functions
> are to be classified as if consisting only of that component or as being that
> machine which performs the principal function.

HTSUS § XVI, Note 3.[7]  The note is one of "general application which, in certain circumstances,

calls for a principal function analysis."  BenQ Am. Corp., 646 F.3d at 1380.  A comparative

---

[7] The Explanatory Notes to Note 3 elaborate, describing the multiple machines as "generally
complementary and are described in different headings of Section XVI."  EN § XVI(VI).
Moreover, "machines of different kinds are taken to be **fitted together to form a whole** when
incorporated in one in the other or mounted one on the other, or mounted on a common base or
frame or in a common housing."  Id. (emphasis in original).  Examples of composite machines
are: "printing machines with a subsidiary machine for holding the paper (heading 84.43); a
cardboard box making machine combined with an auxiliary machine for printing a name or
simple design (heading 84.41); . . . a cigarette making machinery combined with a subsidiary
packaging machinery (heading 84.78)."  Id.  The court agrees with the parties that the Pacmed is
a composite machine.

principal function analysis is not necessary, however, "when the composite machine is covered

as such by a particular heading." EN § XVI(VI); see also Sony Elecs., Inc. v. United States,

Slip. Op. 13-153,  2013 WL 6728681, at *14 (Dec. 23, 2013) ("Note 3 is only applicable where

an item possesses multiple functions that are accounted for in different tariff provisions.  Where

a heading describes all of the functions of a multifunction article, an analysis of the principal

function under Note 3 is not necessary.").  Although not cited by the parties, Note 4 to Section

XVI is also instructive:

> Where a machine (including a combination of machines) consists of individual
> components (whether separate or interconnected by piping, by transmission
> devices, by electric cables or by other devices) intended to contribute together to a
> clearly defined function covered by one of the headings in chapter 84 or chapter
> 85, then the whole falls to be classified in the heading appropriate to that function.

HTSUS § XVI, Note 4.

The parties' dispute centers around whether the sole or principal function of the Pacmed

machine is performed by the device's packing machinery.  The Pacmed produces plastic pouches

that encase pills that are individually labeled with identifying information for proper

administration to the patient.  This production process includes storing, sorting, packaging, and

labeling functions.  The packing operation, however, creates sealed pouches from a reel of either

plastic or cellophane by thermally sealing the material around a specified quantity of medication.

Pl. Stmt. of Facts ¶ 7, 12.  The Pacmed does not merely "fill, close, seal and label [a] container,"

as described in the second clause of heading 8422, because the material used in packing is not a

"container" until the machine seals the pharmaceuticals within it.  Thus, pursuant to GRI 1, the

operative term under consideration in heading 8422 is in the fourth clause: "other packing or

wrapping machinery (including heat-shrink wrapping machinery)."  See also EN Heading 84.22

(listing "wrapping . . . machines, including those with provision for forming, printing, . . . closing

or otherwise finishing the packing").  In addition to packing, the labeling function (as well as any weighing or measuring operation) is contemplated by heading 8422 as confirmed by Explanatory Note 84.22.  See EN Heading 84.22 (classifying "devices for weighing and measuring" and "[l]abeling machines, . . . which also print, cut and gum the labels" under "machines . . . generally, for packing").

McKesson contends that the storing, sorting, monitoring, and weighing of the pills, as well as the labeling and printing of the pouches fall within the ambit of "packing," as described in the Explanatory Notes.  McKesson Br. at 9–14.  Although Customs rulings are not binding on the court, McKesson notes the similarities between this case and Customs' classification of "a packaging system used for the delivery of transdermal drugs to patients" under heading 8422.  Id. at 8 (citing Cust. Rul. NY N233938 (Oct. 23, 2012)).  In that ruling, Customs concluded that several machines working as a "functional unit" to form, fill, and seal pouches containing a predefined dosage of an active pharmaceutical ingredient all contributed "to a clearly defined function of packaging (forming, filling, and sealing)."  Cust. Rul. NY N233938 (implicitly referring to Note 4 to Section XVI).  McKesson argues that the Pacmed performs the same function, dropping a predefined quantity of medicine into a packaging machine, printing a label on the pouching material, and sealing the pouch closed.  McKesson Br. at 8–9.

McKesson also rejects Customs' finding that the Pacmed's principal function, by application of Note 3 to Section XVI, is the "distribution of pharmaceuticals."  See McKesson Br. at 9, 13–14; McKesson Resp. at 9.  Rather, McKesson argues, the Pacmed only "enable[s] such distribution" by providing a "packag[ed] medicine in a customized quantity" to a nurse or pharmacist who can "easily, accurately, and confidently . . . deliver it to the patient."  McKesson

Br. at 13–14.  Contrary to Customs' ruling, here, McKesson concludes, the principal function is

packing, performed by the Pacmed's constituent packing machine.  Id. at 9.

        The government, for its part, argues that classification under heading 8422 is

inappropriate because the heading describes only one of several stages performed by the

Pacmed's distribution system.  Gov't Br. at 10, 15.  Moreover, the government claims that, in

addition to storing, sorting, packing, and labeling, the Pacmed

> segregates, weighs, and monitors the inventory, . . . tracks the identity and amount
> of medication [throughout the entire process with bar codes and measuring tools], .
> . . interfaces with the hospital or pharmacy computer system to receive and process
> the patient's information, . . .  dispenses the medication pursuant to [the health care
> provider's] directives, . . . and labels the medication in a 'personalized' way, . . .
> ensur[ing] that the proper amount and type of medication is placed in the
> individual packages and that the label contains the specific patient information.

Id. at 28.  It argues that, because "no one operation is more important in the system as compared

to the next," the listed operations cannot be considered "incidental" to the packing operation.  Id.

        The government further concludes that the Pacmed performs no one principal function,

such that Note 3 is not applicable to classification.  Gov't Reply at 5 (quoting EN §XVI(VI),

stating, in pertinent part, that "[w]here it is not possible to determine the principal function, and

where, as provided in Note 3 to the Section, the context does not otherwise require, it is

necessary to apply [GRI] 3(c)," which requires classification under the heading last in numerical

order).  Alternatively, it supports Customs' determination that the principal function of the

Pacmed is the distribution of pharmaceuticals, which does not have a corresponding heading in

Chapter 84, and so requires classification under the residual heading 8479.  See Gov't Br. at 24;

Gov't Reply at 5.

        The government's arguments are unconvincing.  The enumerated functions are incidental

to the packing function as set forth in the Section, Chapter, and Explanatory Notes.  First, as

discussed above, the weighing, measuring, and labeling operations are specifically identified as

incidental to the packing machinery in the Explanatory Notes.  See EN Heading 84.22.  Second,

the storing operation is similarly incidental to the packing.  The Pacmed stores canisters in its

upper cabinet, which in turn store pills.  Pl. Stmt. of Facts ¶ 4.  The machine's ability to store

medications for future use is a result of the Pacmed's intermittent use.  In other kinds of packing

machines, a hopper or conveyor continuously feeds an item into the machinery that "fills" a

container.  See, e.g., Cust. Rul. NY 879640 (Nov. 17, 1992) (stating that, for machines "used to

automatically form and fill flexible plastic pouches with milk or other liquids[,] . . . the pouches

are continuously filled from a constant level buffer tank, located at the top of the machine, which

is fitted with a proportional valve and a ball-cock."); Cust. Rul. NY 866831 (Sept. 19, 1991)

(describing a machine that fills pots and trays with soil as being fed by an "automatic pot

conveyor").  Because the items are continuously fed into the machinery, they are not "stored."

See store, WEBSTER'S THIRD INTERNATIONAL DICTIONARY (2002) ("to stock or future against a

future use"); store, OXFORD ENGLISH DICTIONARY (2d ed. 1989) ("to keep in store for future use;

to collect and keep in reserve; to form a store, stock, or supply of; to accumulate, hoard).  Here,

because the Pacmed requires a user's input to operate, the pills are not continuously fed into the

lower packaging cabinet and are stored for future use.  Thus, the Pacmed's storing operation

facilitates its ability to create pouches from a variety of pharmaceuticals on demand.

Accordingly, the storage of the pills is incidental to the packing.

     Third, the sorting or segregating operation is, again, incidental to the packing function.

The Pacmed sorts pills from various canisters to be packaged within one pouch as part of a

multi-dose prescription.  See Gov't Exhibits in Supp. of Its Cross-Mot. for Summ. J. Ex. 8

("Pacmed Core Operator's Manual, Bates Nos. 000930-001115") at 7, 15, Doc. No. 90-10

("Gov't Ex. 8"). The sorting operation facilitates the filling and sealing functions of the packing machine by ensuring that the appropriate type and quantity of medication is packed in each pouch. Customs' rulings lends support to the notion that the sorting operation of the Pacmed is incidental to its packing of unit-dose or multi-dose pouches. In Customs Ruling HQ W968275, it determined that "syringe finishing line" machines, which label, arrange, connect, and package pre-filled syringes, were classified under heading 8422. See Cust. Rul. HQ W968275 (Jan. 26, 2010). The machine consisted of an "Accumulator," which "serve[d] as a collection and sorting area to accumulate the syringes for the next step in the processing." Id. Customs determined that the "Accumulator . . . facilitate[s] the labeling, closing and sealing functions by . . . sorting . . . the syringes." Id.; see also Cust. Rul. HQ 958809 (May 23, 1996) (finding that an automatic rose grading machine, which performed a sorting function by grading and bunching roses of similar lengths and thicknesses, was classified under heading 8422). Accordingly, Customs did not determine that the sorting function removed the machines from classification under heading 8422. The court arrives at the same conclusion here.

Fourth, the parties stipulated that the "pouch is . . . conveyed through a slot at the bottom of the unit." Pl. Stmt. of Facts ¶ 13. But Customs described the pouch as being "dispensed through a slot on the front." Cust. Rul. NY 074022. McKesson contends that Customs' use of the term "dispensing" is not helpful, as that term does not appear in the headings of Chapter 84, and because dispensing is of the same class or kind as the functions listed in heading 8422. Id. at 10. It points to several previous Customs rulings finding that a machine with a dispensing function was classified under heading 8422. Id.; see Cust. Rul. NY K87599 (July 30, 2004) (classifying a "hand-held device [that] dispenses 3/4" transparent tape" under "machinery used for filling, closing, sealing, capsuling or labeling boxes, bags or similar containers"); Cust. Rul.

HQ 957269 (Mar. 3, 1995) (classifying a machine "used by farmers or contractors to automatically wrap round silage bales with plastic film" under the same heading, noting that it "dispenses plastic film while [a] turntable rotates in order to wrap the bale"); Cust. Rul. NY 866831 (Sept. 19, 1991) (classifying a machine "used to automatically fill pots and trays with soil" under 8422 even though one potting machine "incorporat[ed] a pneumatic pot dispenser"). Accordingly, McKesson concludes that Customs disingenuously determined that "dispensing" is a separate function falling outside the packing provision.  McKesson Br. at 11.  The court agrees.

In other packing machines, transfer conveyors continuously deliver the item to the next downstream machine.  Here, the Pacmed operates with the input of a user, to create and deliver a pre-determined number of pouches.  The choice of the word "dispensing" by Customs to describe this process and the machine's function as a whole seems to relate to the pharmaceutical nature of the item packaged.  In actuality, any packaging machine delivers or distributes, i.e., dispenses, a packaged item in some way, either to the user of the machine or to the next downstream machine.  Dispensing is a part of all packaging.  See dispense, OXFORD ENGLISH DICTIONARY (2d Ed. 1989) ("to mete out, deal out, distribute; to bestow in portions or from a general stock"); dispense, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) ("to deal out in portions : distribute, give, provide").  Thus, Customs reliance on any "dispensing" function is inapposite.

Finally, the monitoring, tracking, interfacing, processing, and "personalization" operations are specifically addressed by Note 5(E) to Chapter 84.  Note 5(E) provides that "[m]achines incorporating or working in conjunction with an automatic data processing [("ADP")] machine and performing a specific function other than data processing are to be classified in the headings appropriate to their respective functions or, failing that, in residual

headings.[8]  HTSUS Ch. 84, Note 5(E).  Here, the Pacmed includes a touch screen that runs an

Automated Tablet Dispensing and Packaging Software (ATDPS).  See Gov't Ex. 8 at 7, 13, 15–

16.  Groups of prescriptions, or "batches," are created by a software on an external computer and

are transferred to the Pacmed Core, the software used to package drugs operating on the PC

workstation.  Id. at 13, 17.  This information is relayed to the touch screen, from which batches

can be packaged.  Id. at 17.  The batches "contain all of the information necessary for the

packaging process to be completed.  This includes information such as patient name,

administration date, administration time, mnemonic (drug code), quantity, etc."  Id.  The Pacmed

Core software on the PC workstation performs the majority of actions.  Id. at 37.  The ATDPS

touch screen serves to provide information about the batch in process, allow communication

between the Pacmed Core software and Pacmed unit, and permit the user to start and stop the

packaging process and refill canisters.  Id. at 26, 63.  The operations alleged by the government

are data processing functions, handled by the Pacmed Core software.  The component machinery

performing the storing, sorting, packing, labeling, and other operations receive data from the

ATDPS touch screen and Pacmed Core PC workstation to "personalize" pouches with individual

patient-specific medication and labeling.  The Pacmed's ability to communicate with a hospital

or pharmacy's system, to track and monitor the medication, and to print unique labels is derived

from the internal and external automated data processors using the Pacmed's proprietary

---

[8] Explanatory Note (E) to Note 5(E) of Chapter 84 adds that the "machine incorporating an automatic data processing machine" is classified "in the heading corresponding to the function of that machine or, in the absence of a specific heading, in a residual heading, and not in heading 84.71."  The court concludes that the Pacmed both incorporates an ADP machine, the ATDPS touch screen, and works in conjunction with an ADP machine, the computer workstation running the Pacmed Core software.

software and Microsoft Windows.  The Pacmed, however, has a specific function other than data processing under which it may be classified—to pack.

In summary, each allegedly distinct operation supports or is part of the Pacmed's primary packaging function.  Thus, the Pacmed is a packing machine that is classified under heading 8422 of the HTSUS.

Note 3 to Section XVI does not alter this conclusion, to the extent any principal function analysis is required.  For composite machines, classification is determined "according to the principal function of the composite machine."  EN § XVI(VI).  The principal function of the Pacmed is to provide medical professionals with packaged medications in individual, labeled packages.  The Pacmed contains storage hoppers in the upper cabinet, a packing machine in the lower cabinet, an available LCD monitor, and a slot in the front used for delivering the pouches. The principal function, however, is performed by the packing machinery.  The optical scanners, storage hoppers, electronic scales, dispensing slot, and ATDPS screen contribute functionalities arguably beyond that of a basic packing machine, including the holding of large amounts of medicine, continuous monitoring of inventory, minimization of packaging errors, and convenient means of retrieving packaged medication.  These additional functionalities, if considered separately, are complementary to the principal function of packing, as they all relate to improving the speed, efficiency, and reliability of the packing operation.  See Belimo Automation A.G. v. United States, 774 F.3d 1362, 1366 (Fed. Cir. 2014) (finding that a device connected to an actuator that measures the position of an air-conditioner's damper blades was an additional functionality, and did not change the classification of the actuator as an electric motor); see id. ("In other words, although the presence of the [device] may allow the motor to do its job more efficiently and accurately, and in some cases more safely, [its] principal function is

nonetheless to assist in moving the damper blades."). Despite the important operations the

Pacmed performs in the interest of proper compliance, patient safety, and medication

management, and in storing large amounts of medications in its hoppers, the Pacmed's essence is

that of a packing machine.

The government's argument that the principal function of the machine, if any, is to

distribute pharmaceuticals does not help to resolve the classification issue. The distribution of

medication is a multistep process, not a function of a machine. The principal function of the

Pacmed cannot be the distribution of medicine because the Pacmed does not perform the crucial

steps required in a distributional scheme, including the delivery of the medication to the patient.

Indeed, the government's expert witness defined "distribution" as "procurement, storage,

packaging and dispensing." Gov't Exhibits in Supp. of Its Cross-Mot. for Summ. J. Ex. 5

("Relevant excerpts from the transcript of the deposition of Dr. Edgar Gonzalez, taken July 14,

2015") at 79, Doc. No. 90-7. The Pacmed does not procure the medication, nor does it assist in

the prescription of medications. Moreover, delivery and administration to patients is a critical

step in the distributional chain. Those are not functions performed by the Pacmed, but rather by

medical professionals.

The government's argument that the principal purpose of the Pacmed should govern the

classification of the merchandise is similarly unavailing. The government points to Note 7 to

Chapter 84, which states in relevant part:

> A machine which is used for more than one purpose is, for the purposes of
> classification, to be treated as if its principal purpose were its sole purpose.

> Subject to note 2 to this chapter and note 3 to section XVI, a machine the principal
> purpose of which is not described in any heading or for which no one purpose is
> the principal purpose is, unless the context otherwise requires, to be classified in
> heading 8479.

HTSUS Ch. 84, Note 7.  The government argues that the principal purpose of the Pacmed machine is to "promote compliance, patient safety and medication management."  Gov't Br. at 11 (quoting Pl. Stmt. of Facts ¶ 19).  Thus, the government contends, because no heading of Chapter 84 describes the principal purpose of the Pacmed, application of Note 7 requires classification under heading 8479.  See Gov't Reply at 4.  The government errs in two ways. First, the other Section, Chapter, and Explanatory Notes adequately guide the court in determining the appropriate classification at issue, such that the introduction of Note 7 would not require classification under heading 8479.  See HTSUS Ch. 84, Note 7 (stating that the note is "[s]ubject to note 2 . . . and note 3 . . .").  Second, the government conflates the aspirational goals of the users of the Pacmed with purpose or use as a classification principle.  Through its composite machine functions, the Pacmed's purpose is, with minimal error, to provide medical professionals with packaged medications labeled with patient-specific information. Appropriately packaged and labeled medication helps to, in the language of the parties, "promote compliance, patient safety and medication management."  See Pl. Stmt. of Facts ¶ 19. Notwithstanding that the statement of facts uses the term "purposes," these are goals achieved not only through the use of the Pacmed, but also through the diligence of the health care professionals that stock the machine, prescribe the medication, and deliver the pharmaceuticals to the right patients.  Because the Pacmed is properly classified under 8422 as a packing machine, it cannot be classified under the residual heading 8479 by way of Chapter Note 7, or otherwise.

## III.   The Pacmed's Subheading Classification

GRI 6 governs classification at the subheading level and requires a renewed sequential application of the first five GRIs.  See GRI 6, HTSUS ("For legal purposes, the classification of

goods in the subheadings of a heading shall be determined according to the terms of those

subheadings and any related subheading notes and, mutatis mutandis, to the [GRIs], on the

understanding that only subheadings at the same level are comparable.").  As stated above,

because the Pacmed creates a container by packing and wrapping the pharmaceuticals within a

packaging material, the operative term within heading 8422 is "other packing or wrapping

machinery."  Accordingly, the proper subheading classification is the corresponding subheading

8422.40, for "Other packing or wrapping machinery (including heat-shrink wrapping

machinery)."  Subheading 8422.30—listing "Machinery for filling, closing, sealing or labeling

bottles, cans, boxes, bags or other containers; machine for capsuling bottles, jars, tubes and

similar containers; machinery for aerating beverages"—does not apply because the Pacmed does

not simply fill a container, as discussed in connection with GRI 1, supra page 9.  The remaining

subheadings are not relevant for the classification at issue.[9]  Subheading 8422.40 is further

broken out into 8422.40.11, which is for tobacco products or candy, clearly not applicable, and

8422.40.91, "Other."  Accordingly, the Court concludes that the proper tariff classification for

McKesson's Pacmed machine is 8422.40.91, HTSUS.

---

[9] These subheadings can readily be discarded: heading 8422.11 is for "Dishwashing machines: of
the household type," heading 8422.20 is for "machinery for cleaning or drying bottles or other
containers," and heading 8422.90 is reserved for "Parts" of machines falling under the other
subheadings.

## CONCLUSION

For the foregoing reasons, the court grants McKesson's motion for summary judgment,

denies the government's cross-motion for summary judgment, and holds that the Pacmed

machines at issue are properly classified under subheading 8422.40.91, HTSUS, free of duty.

Judgment will be entered accordingly.


           /s/ Jane A. Restani
          Jane A. Restani, Judge


Dated: February 28, 2019
   New York, New York